UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COREY THOMAS,

        Plaintiff,                                       Case No. 18-13033

vs.                                                 HON. MARK A. GOLDSMITH

GREAT LAKES WATER AUTHORITY,

        Defendant.
_____/

**<u>OPINION & ORDER</u>**
**<u>GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR</u>**
**<u>SUMMARY JUDGMENT (Dkt. 30)</u>**

      Plaintiff Corey Thomas accepted a position with Defendant Great Lakes Water Authority ("GLWA") in 2016 based in part on promises of advancement within GLWA. Thomas had over fifteen years of experience working in finance departments, but advancement within GLWA did not come. After he began voicing his concerns that he thought GLWA's refusal to move him up the ranks might be racially motivated, he was urged to accept a less distinguished position in the IT Department doing a variety of tasks, including physical labor. The physical tasks took their toll on Thomas, and he took medical leave due to a back injury not long after starting in the IT Department. While on leave, Thomas filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC"), and later filed the present case alleging discrimination and retaliation under Title VII and the Michigan analog. GLWA has filed a motion for summary judgment (Dkt. 30). Thomas filed a response brief (Dkt. 32), to which GLWA filed a reply brief in support of its motion (Dkt. 36). For the reasons discussed below, GLWA's motion is granted in part.

## I. BACKGROUND

Thomas worked with troubled youth for several years before obtaining his B.A. in criminal justice in 1998. Pl. Counterstatement of Material Facts ("PCMF") ¶ 7 (Dkt. 32); Thomas Dep., Ex. B to Mot., at 15-22 (Dkt. 30-3). In addition to his criminal justice work, Thomas took a position with the City of Detroit as a Public Housing Assistant in 1999. Thomas Dep. at 22-23. In 2000, he transferred to the Detroit Water and Sewage Department ("DWSD") to be an intermediate government analyst. Def. Stmt. of Material Facts ("DSMF") ¶ 8 (Dkt. 30).[1] In that position he drafted board letters, made requests for proposals, evaluated vendors, and gathered some of the financial information for city contracts. Thomas Dep. at 30-32. After a few years, DWSD promoted Thomas to a senior government analyst. Id. at 33-34. In his new position, he worked in different departments and had a role in, among other things, managing city assets, contracts, and grants. Id. at 34-35. After being demoted to intermediate government analyst for about a year to avoid being laid off, Thomas was again promoted to senior government analyst in 2006, when he took a position in DWSD's Capital Improvement Section ("CIP"), in the finance department. Id. at 39-40.

The CIP is the starting point for new DWSD projects. Id. at 41. Thomas had a role in every aspect of the contracts assigned to him. He coordinated DWSD projects with engineers, city officials, and vendors, and he helped prepare contracts for submission to the Board of Water Commission for approval. Id. at 40-41, 48-49. Once a contract was approved, Thomas monitored the implementation of the contract and tracked any changes, including financial changes, until the project closed. Id. at 41. Additionally, Thomas prepared monthly executive reports which, among

---

[1] Where the DSMF is cited for a proposition, Thomas has either admitted the proposition or not disputed it in his counterstatement of facts.

2

other things, reported contract expenditures. Id. at 43. Thomas did not have an accounting background when he joined DWSD, but he developed accounting skills through his senior analyst positions. Id. at 45-47.

As part of DWSD's restructuring in late 2015, DWSD reduced its more than 250 employment classifications to 43 classifications. DSMF ¶ 3. Relevant here are the classifications Office Support Specialist ("OSS"), Professional Administrative Analyst ("PAA"), and Management Professional. Id. ¶ 4. Employees whose positions did not readily fit into the new classification system were named Special Projects Technicians, a temporary six-month assignment, until DWSD could identify a specific position. Id. Thomas's senior government analyst classification was eliminated, and he was temporarily reclassified as a Special Project Technician in September 2015. DSMF ¶ 10; Thomas Dep. at 64-65. Thomas's work did not change in any meaningful way, but he did help train his new supervisor, Monica Daniels, who took over as the CIP Manager. DSMF ¶¶ 11-12; Thomas Dep. at 69.

Also in late 2015, as part of Detroit's emergence from bankruptcy, GLWA was created as a regional authority providing water and wastewater treatment services to Michigan municipalities. DSMF ¶ 1. At its inception, most of GLWA's staff came from DWSD. Id. ¶ 2. DWSD employees were offered positions at GLWA at the same classification and salary level that they had with DWSD. Id. Daniels and DWSD's Finance Director, Mike Huber, accepted positions with GLWA in October 2015. DSMF ¶ 14; Huber Dep., Ex D. to Mot., at 9 (Dkt. 30-5). Daniels and Huber maintained their respective positions of CIP Manager and Finance Director. DSMF ¶ 14. Thomas was reclassified at DWSD as an OSS I in December 2015. Id. ¶ 13. In the same month, Thomas was offered a PAA position with DWSD. DSMF ¶ 15. However, at the urging of Daniels, Huber,

3

and Nicolette Bateson, then DWSD's CFO, and later GLWA's CFO, Thomas took a position with GLWA as an OSS I. Id. ¶ 18.

Thomas was overqualified for the OSS I position. PCMF ¶ 10. The OSS I position required only a high school diploma and one year of experience. Id. ¶ 13. Thomas was a college graduate with over fifteen years of experience, most of which was in the finance department at DWSD. Id. Daniels told Thomas that because he signed up late, the OSS I position was all that was available at GLWA. Thomas Dep. at 77, 99-100. Nonetheless, he took the position, because Huber and Daniels assured him that he would be promoted to PAA in July 2016. PCSF ¶ 13.

Thomas took on greater responsibility in GLWA's CIP section. Thomas Dep. at 83-85. Also reporting to Daniels in the CIP section were Ashley Harker, Michael Gould, and Joseph McMichael. DSMF ¶ 25. Harker, who is white, has a B.A. in accounting and finance and an M.B.A. Id. Gould, who is white, has a B.A. in accounting and M.A. degrees in finance and taxation. Id. McMichael, who is African American, has a B.A. in accounting. Id. GLWA classified Harker, Gould, and McMichael as Management Professionals and paid them significantly higher salaries than Thomas. Id.; Thomas Dep. at 99. But none of them knew as much as Thomas did about the CIP section. Thomas Dep. at 83-85. In addition to his own responsibilities, Thomas often assisted Harker, Gould, and McMichael with their work, and even took on some of their workload. Id. He also took on some of Daniels's extra work, and he had specific assignments passed down from Bateson. Id.

Because Thomas was a new hire to GLWA, he was subject to a twelve-month probationary period, which included a performance review in July 2016. DSMF ¶ 26. Daniels evaluated Thomas as exceeding expectations in seven categories, meeting expectations in nine categories, and needing improvement in three categories (flexibility/adaptability, learning/training, and

4

problem solving). July 2016 Evaluation, Ex. Q to Mot. (Dkt. 30-18). Thomas did not receive an unsatisfactory rating in any category. Id. Daniels's overall evaluation of Thomas was that he was "Making Acceptable Progress." Id. The only other available overall rating was "Must Show Improvement for Permanent Status." Id.

After the evaluation, Daniels suggested to Thomas that the best way to proceed with his advancement was to be promoted to an OSS III position. Thomas Dep. at 91. Daniels advised Thomas to focus on salary, rather than the PAA title, until he reached the salary cap for an OSS III. Id. at 90-91. Daniels told Thomas that he could be reclassified as a PAA sometime later, which Thomas understood to be to his advantage, because an immediate promotion to PAA would not necessarily result in a corresponding salary increase under GLWA's advancement system. Id. Daniels testified that she had some uncertainty with respect to the process, but she said that Thomas should have been either an OSS III or a PAA. Daniels Dep. at 84-86. Daniels sent a request to Bateson to promote Thomas to OSS III with a salary increase at the top of the classification. DSMF ¶¶ 28-29. Upon review of Daniels's July 2016 evaluation, Bateson denied the request. Id. ¶¶ 30-31. Thomas believes that Bateson's decision was based on racial discrimination. PCSF ¶¶ 34. Thomas complained about the discrimination to Daniels, to the human resources department, and to his union. Id.

In May 2017, GLWA eliminated the CIP section, and terminated Daniels. DSMF ¶ 35. Thomas, McMichael, Gould, and Harker were all moved to other positions within the finance department. Id. Jill Kosters, GLWA's Financial Reporting & Accounting Manager, became Thomas's new supervisor. Id. ¶ 35. Bateson directed Thomas to train Kosters and the other members of her department, all Management Professionals, on his job duties. PCSF ¶ 35; Thomas Dep. at 140. Toward the end of summer, Kosters approached Thomas and told him about a position

5

in the IT Department, which she and Bateson thought would be a good opportunity for him to advance professionally. Thomas Dep. at 139-140. Out of fear of being terminated, Thomas began working in the IT Department in August 2017. Id. at 140.

Thomas understood the IT Department position to involve solving computer related problems and other office work. Id. Instead, Thomas describes the work as being largely physical. Id. at 141. He says that he was doing physical labor, such as dealing with trash, unloading trucks, moving heavy equipment, and cleaning "the cage," where IT equipment is stored. Id. Thomas complained to the human resources department and his union that he thought Bateson intentionally misled him into taking the IT Department position due to racial animus. Id. at 146-149. In October 2017, Thomas took leave for back problems. DSMF ¶ 40. In November, Thomas asked to be transferred to a different position, but the request was denied. PSAF ¶ 61. He also filed a charge of discrimination with the EEOC. Thomas's EEOC charge stated the following:

> On 1/1/2016 I started working for the above referenced employer as an Office Support Specialist I.
>
> On or about 6/2017 my Chief Financial Officer denied me a performance review for the second time. The first being 7/2016. This denied me salary adjustments I was entitled to and promised. I am aware of coworkers who received performance reviews and salary adjustments. The Chief Financial also made me perform work outside of my job description including heavy physical labor. I am not aware of any coworkers required to perform the tasks I did.
>
> I believe [I] am being treated under different terms & conditions of employment due to my race (Black) in violation of title VII of the Civil Rights Act of 1984, as amended.

11/30/17 EEOC Compl., Ex. AA to Def. Mot., at PageID.451 (Dkt. 30-28).

GLWA extended Thomas's leave though January 2018. DSMF ¶ 40. While on leave, DWSD offered Thomas a PAA position in its Finance/Procurement department at a higher salary.

PCMF ¶ 41. Thomas took the position with DWSD, in part, because it was a good offer. But he also took the position to get away from what he characterizes as "torture" at GLWA. Id. ¶ 41.

Thomas filed a complaint alleging racial discrimination and retaliation in violation of Title VII and the Elliott-Larsen Civil Rights Act ("ELCRA"). Am. Compl. (Dkt. 5). GLWA has moved for summary judgment.

## II.  STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

## III.  ANALYSIS

GLWA argues that Thomas has not established a prima facie case of discrimination or retaliation. It also argues that it had legitimate reasons for its employment decisions and that Thomas has no evidence to suggest otherwise. Thomas argues to the contrary. GLWA's arguments will be taken in turn.

7

### A. Race Discrimination

Title VII prohibits an employer from discharging "any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a). Because Thomas offers no direct evidence of discrimination, the Court employs the familiar McDonnell Douglas burdening-shifting framework used to establish discrimination by circumstantial evidence. Wheat v. Fifth Third Bank, 785 F.3d 230, 237 (6th Cir. 2015).

Under the three-step McDonnell Douglas framework, the first step requires the plaintiff to establish a prima facie case of discrimination. Id. The second step requires the employer to articulate legitimate, nondiscriminatory reasons for the adverse employment action. Id. And, if the employer meets its burden, the third step requires the plaintiff to show that the employer's nondiscriminatory reasons were pretext for discrimination. Id.

### 1. Prima Facie Case

GLWA argues that it is entitled to summary judgment on Thomas's racial discrimination claim, because Thomas has not established a prima facie case of discrimination. Mot. at 11-20. Thomas disagrees. Resp. at 14-19. GLWA's argument misses the mark.

Thomas's burden of establishing a prima facie case of race discrimination is not onerous. Id. To establish a prima facie case for race discrimination under Title VII and the ELCRA, Thomas must show that "(1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." Laster v. City of Kalamazoo, 746 F.3d 714, 727 (6th Cir. 2014).

8

GLWA argues that Thomas has not met his burden with respect to the second, third, and fourth elements. It concedes that Thomas has satisfied the first element.

### a. Qualified For the Position and Performed it Satisfactorily

GLWA argues that Thomas was not qualified for an OSS III or PAA position, because he received a "Needs Improvement" in three categories on his employee performance review. Mot. at 15.[2] GLWA represents that Daniels concluded that Thomas was not qualified to move out of the OSS classification, let alone the PAA position. Id. Thomas argues that this is a fact question. Resp. at 18. Thomas has the better part of the argument.

Whether Thomas was qualified for an OSS III or PAA position is a matter for the jury. DWSD offered Thomas a PAA position before he took the position with GLWA. While Thomas was on medical leave, DWSD again offered Thomas a PAA position, which he accepted. Additionally, Daniels, one of Thomas's direct supervisors at both DWSD and GLWA, testified that Thomas should have been classified either as an OSS III or a PAA. Daniels Dep. at 84-86. Daniels recommended promoting Thomas to an OSS III position as a necessary step to get Thomas classified as a PAA. Id. at 92. GLWA's arguments to the contrary are fact bound in light of the evidence presented by Thomas. For the purposes of summary judgment, Thomas has satisfied this element of his prima facie case.

---

[2] GLWA also argues that under Thomas's collective bargaining agreement ("CBA"), an applicant must receive a satisfactory rating on each part of his evaluation to be eligible for promotion. Mot. 15 n.5. As noted above, Thomas's performance evaluation had three areas marked where he needed improvement. However, it does not appear that GLWA is a party to the CBA attached to GLWA's motion. CBA, Ex. BB to Mot. (Dkt. 30-29); the CBA is between the union and DWSD. The CBA between DWSD and the union is not probative of whether Thomas was qualified for the OSS III or PAA position at GLWA.

### b. Adverse Employment Action

GLWA argues that Thomas has not suffered an adverse employment action. Mot. at 11-13. Thomas argues that he suffered adverse employment actions when he was originally classified in the OSS-I position, denied reassignment to a higher position after six months, transferred to a menial labor position, denied a transfer from the menial labor position, and constructively discharged. Resp. at 15. Thomas is correct in most respects.

An adverse employment action is a "materially adverse change in the terms or conditions" of employment. Kocsis v. Multi-Care Mgmt. Inc., 97 F.3d 876, 885 (6th Cir. 1996). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Material adverse actions may also include "a less distinguished title, diminished options for advancement, or other unique indices." Freeman v. Potter, 200 F. App'x 439, 442 (6th Cir. 2006). However, "reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment actions." Policastro v. Nw. Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002). Whether something constitutes an adverse employment action is evaluated by considering whether the action would be "objectively intolerable to a reasonable person." Id.

Thomas characterizes his "initial classification as an OSS I" as an adverse employment action, which is best understood as a failure or refusal to hire theory of liability. Title VII makes it an unlawful employment practice for an employer to fail or refuse to hire an individual with respect to privileges of employment, because of the individual's race. 42 U.S.C. § 2000e-2(a). GLWA offered Thomas, a college graduate with over fifteen years of experience, an OSS I position, which required only a high school diploma and one year of experience. PCSF ¶ 13.

10

Thomas accepted the position, and turned down a PAA position with DWSD, because he was promised to be promoted to a PAA position after six months. Whether GLWA refused to offer Thomas a better position due to racial animus or because it had hired all of the PAA and Management Professionals it needed at the time is a question for a jury.

Thomas's discrimination claims cannot, however, proceed on a failure to promote theory. To proceed on a failure to promote theory a plaintiff must, among other things, show that "an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied." White v. Columbus Metro. Hous. Auth., 429 F.3d 232, 240 (6th Cir. 2005). This is not a case where Thomas was passed over in favor of another individual. Thomas sought a promotion based on representations made to him by management staff at the time he was hired. There was no open position to which he applied. Therefore, he cannot sustain a theory of liability based on a failure to promote where no other individual was selected over Thomas at the time his request for a promotion was denied. See Pawlaczyk v. Besser Credit Union, No. 14-cv-10983, 2015 WL 4208649, at *12 (E.D. Mich. Apr. 13, 2015) (recommending denying the plaintiff's failure to promote theory where there was no open promotion, the plaintiff never formally applied, and the defendant never selected someone else to fill the position), report and recommendation adopted, No. 14-cv-10983, 2015 WL 4208658 (E.D. Mich. July 10, 2015).

Thomas's new assignment in the IT Department is a different matter. Even if a reassignment does not include a salary decrease, "it can nonetheless be considered an adverse employment action where there is evidence that the employee received 'a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th

11

Cir. 2010) (quoting <u>Kocsis</u>, 97 F.3d at 885-886). Whether Thomas's transfer to the IT Department was an adverse action is a fact question.

GLWA argues that it assisted Thomas with finding a position in the IT Department, which he willingly accepted. Mot. at 13. Thomas paints a different picture. Thomas testified that after he essentially trained his own replacements, who were all Management Professionals, he took the IT Department position, at Kosters's and Bateson's urging, out of fear of being terminated. Thomas Dep. at 140. Thomas maintains that the IT Department position was essentially a physical labor position, and that the position did not draw on his years of administrative experience in finance departments. Resp. at 17. And when he requested a transfer, the transfer was denied. There are fact questions with respect to whether a reasonable person in Thomas's position would consider the transfer to the IT Department voluntary, in light of Kosters's and Bateson's urging, and whether the IT Department position was a less distinguished position with significantly diminished material responsibilities.

Thomas has also made his case that he was constructively discharged. Resp. at 15, 18. A plaintiff may establish an adverse employment action by showing that he was "constructively discharged," meaning that the employer purposely made the working conditions so intolerable that the plaintiff was involuntarily forced to resign. <u>Kocsis</u>, 97 F.3d at 886. To demonstrate constructive discharge, a plaintiff must adduce evidence that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit. <u>Logan v. Denny's, Inc.</u>, 259 F.3d 558, 568-569 (6th Cir. 2001). Among the factors the Sixth Circuit has identified as relevant to assessing whether a reasonable person would have felt he was experiencing intolerable working conditions, are

12

reduction in job responsibilities, and reassignment to menial or degrading work. Id. at 569 (quoting Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)).

As noted above, Thomas testified that despite his substantial DWSD and GLWA finance department experience, Bateson deliberately created intolerable working conditions for him when she orchestrated Thomas's transfer to a physical labor position in the IT Department. And when Thomas requested a transfer, his transfer was denied, thus keeping him in the IT position. GLWA may dispute this characterization, but taking the facts in the light most favorable to Thomas, he has met his burden of establishing a prima facie case of constructive discharge.

### c. Similarly Situated

GLWA argues that Thomas has failed to identify any similarly situated employees who were treated more favorably than he was. Mot. at 17-18. Thomas argues that his comparators are his colleagues in GLWA's former CIP section, Harker, Gould, and McMichael, whom Thomas trained and who all had comparable job duties to Thomas. Resp. at 19. To be similarly situated, "the plaintiff must show that 'all of the relevant aspects of his employment situation were 'nearly identical' to those of the comparable employee's employment situation.'" O'Donnell v. City of Cleveland, 838 F.3d 718, 727 (6th Cir. 2016) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)) (some internal marks omitted). "For example, the comparables 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). However, the Mitchell factors are not inflexible requirements, and instead "should be considered and applied on a case-by-case basis." Spratt v. FCA US LLC, 812 F. App'x 348, 353 (6th Cir. 2020) (citing Redlin v. Grosse

13

Pointe Pub. Sch. Sys., 921 F.3d 599, 610 (6th Cir. 2019)). Thomas has the better part of the argument.

Thomas argues that he has identified three comparators who all worked under the same supervisor, were subject to the same standards, and performed substantially the same work. Resp. at 19. GLWA argues that Thomas has not identified any other employee who requested reclassification to OSS III, asked for a 16% raise, and whose supervisor determined the employee needed improvement in a number of key areas. Mot. at 17. GLWA also notes that Harker, Gould, and McMichael all have degrees in business and finance, while Thomas's degree is in criminal justice. Id.

GLWA characterizes Thomas's situation too narrowly. GLWA did not hire its CIP section employees directly out of college. GLWA hired individuals who all had a decade or more of relevant experience in finance departments. And if Thomas is to be believed, as he must be on a motion for summary judgment, he had more experience and expertise than anyone else in the CIP section. Thomas has identified individuals who are arguably similarly situated. The ultimate decision must be left to the jury.

### 2. Legitimate, Nondiscriminatory Reason

Because Thomas has established a prima facie case of discrimination, GLWA must articulate a legitimate, nondiscriminatory reason for the adverse actions Thomas suffered. GLWA's burden "'is one of production, not persuasion.'" Wheat, 785 F.3d at 239 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). GLWA says that Thomas did not progress in GLWA because he was unqualified, and he had weak performance reviews. Resp. at 19-20. Given GLWA's justification, the burden shifts back to Thomas to show that GLWA's reasons for his termination were actually pretext for discrimination. Id. at 240.

### 3. Pretext

GLWA argues that Thomas cannot show that his failure to advance was pretext for discrimination. Mot. at 20. "Pretext can be shown by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." Wheat, 785 F.3d at 240. Thomas did not respond GLWA's pretext argument.

GLWA argues that Thomas has waived his pretext argument. Reply at 7 n.4 (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-1480 (6th Cir. 1989). Street is not a case that addresses waiver. Nonetheless, when a party fails to address an argument, the argument is potentially waived. See Kelly Servs., Inc. v. Creative Harbor, LLC, 846 F.3d 857, 867 (6th Cir. 2017) (noting arguments not raised before the district court are deemed waived on appeal unless waiver would result in a plain miscarriage of justice); see also Schleicher v. Preferred Sols., Inc., 831 F.3d 746, 756 n.2 (6th Cir. 2016) (noting the plaintiff arguably waived his pretext arguments by failing to address it in his response to the defendants' motion). Waiver is not appropriate in this case.

Thomas's prima facie case argument is extensive and supported by credible evidence. It is difficult to imagine how his pretext arguments would differ. GLWA says that Thomas was unqualified for promotion and had a negative performance review. Daniels, who wrote Thomas's performance review, recommended that Thomas be promoted to OSS III with a significant pay increase. And while Daniels noted three areas where Thomas could improve in his evaluation, she also indicated that Thomas was exceeding expectations in seven categories, meeting expectations in nine categories, and that he was making acceptable progress. Additionally, DWSD offered Thomas a PAA position before and after he left DWSD. Thomas makes a very similar pretext

15

argument with respect to his retaliation claim. See Resp. at 24 ("CFO Bateson asserts that Plaintiff was a poor performer. Ms. Daniels, Plaintiff's supervisor, asserts just the opposite. Plaintiff denies ever being accused of poor performance.").

Thomas has made his prima facie case of discrimination and supported his case with credible evidence. Nothing more is required. See Reeves, 530 U.S. at 148 (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

### B. Retaliation

GLWA argues that Thomas has not exhausted his Title VII retaliation claim, Mot. at 21 n.11, and in any event, he cannot establish retaliation under Title VII or the ELCRA, Mot. at 21. Thomas argues that he exhausted his Title VII claim and that he suffered retaliation for making complaints about racial discrimination after he was denied a promotion to OSS III and when he was misled in to accepting an IT Department position. Resp. at 21-24. GLWA is correct that Thomas did not exhaust his Title VII retaliation claim, but it misses the mark on retaliation generally.

Thomas did not exhaust his Title VII retaliation claim. The general rule in the Sixth Circuit is "that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." Dixon v. Ashcroft, 392 F.3d 212, 217 (6th Cir. 2004) (quoting Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 280 (6th Cir. 2002)). This is the so-called "expected scope of investigation test." Id. The inquiry is focused on whether the plaintiff alleged sufficient facts such that the EEOC would have been prompted to investigate different, uncharged claims. Id. There is simply nothing in Thomas's EEOC complaint that would

16

prompt an EEOC investigation into possible retaliation. See 11/30/17 EEOC Compl. at PageID.451. Nor does anything in Thomas's supplement to the EEOC charge suggest retaliation. See EEOC Supplement, Ex. 13 to Resp. (Dkt. 13). Therefore, exhaustion bars Thomas's Title VII retaliation claim.

However, Thomas's ELCRA retaliation claim survives. A plaintiff alleging retaliation under the ELCRA must establish "(1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." In re Rodriguez, 487 F.3d 1001, 1011 (6th Cir. 2007). For the purposes of this motion, GLWA concedes that Thomas has satisfied the first two elements. Mot. at 21. GLWA argues that Thomas cannot establish that he suffered an adverse employment action or that there was a causal connection between Thomas's protected activity and the employment actions. Id.

For the reasons discussed above, Thomas has met his burden of demonstrating that GLWA took employment actions adverse to him. See Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 472 (6th Cir. 2012) ("Michigan courts have incorporated the same definitions and principles found in Title VII retaliation case law."); see also Laster, 746 F.3d at 731 ("Plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context.") (internal marks and citations omitted). Therefore, the remaining dispute is whether there is a causal connection between Thomas's complaints of discrimination and the adverse employment actions.

To establish the causal-connection prong, a plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action." EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) (quoting Zanders v. Nat'l R.R.

Passenger Corp., 898 F.2d 1127, 1135 (6th Cir. 1990)). Evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse employment action quickly followed the plaintiff's exercise of his protected rights is relevant to assessing whether a causal connection exists. Nguyen, 229 F.3d at 563. Establishing a prima facie case of retaliation "is a burden easily met." Id. Thomas has met his burden.

In March 2017, Thomas complained to the human resources department, to Daniels, and to his union that he suspected that he did not receive the OSS III promotion because of discrimination. PCSF ¶ 34. Thomas testified that he continued to make complaints to human resources both before and after his transfer to the IT Department. Thomas Dep. at 146-149. Once in the IT Department, Thomas says that the other OSS-level employees, who were not African American, were not required to do the physical labor that he was asked to perform. Id. at 147. Thomas has met his burden of establishing that his discrimination complaints caused his transfer to the IT Department, where he was treated differently from other OSS-level employees.

GLWA points out that Bateson had asked Thomas to do physical tasks as far back as 2014. Mot. at 25. But intermittent physical tasks are not in the same category of exertion as Thomas has described. Thomas says that the constant physical work exacerbated his pre-existing back injury. Id. at 150-151. When Thomas complained to his supervisor, his supervisor returned him to physical work within a day, which eventually caused Thomas to reinjure his back and take medical leave. Id. at 151. The physical duties Thomas performed in 2014 are markedly different from the duties he was asked to perform in 2017.

As a final matter, the parties have raised some arguments with respect to pretext. Retaliation claims, based on circumstantial evidence, are analyzed under the same three-step McDonnell Douglas framework used to evaluate discrimination claims. Laster, 746 F.3d at 730.

Interestingly, GLWA did not address the second or third step of the framework in its motion. In his response brief, Thomas presumes that GLWA argued that he was a poor performer as its legitimate, nondiscriminatory reason for its actions, which he disputes based on Daniels's testimony. Resp. at 25. In its reply brief, GLWA argues that its failure to reclassify Thomas and provide him with a raise, presumably in 2016, cannot be retaliatory, because Thomas did not complain until March 2017. Reply at 9. And it argues that Thomas's transfer to the IT Department could not be pretext for retaliation, because the transfer resulted from the elimination of the CIP section. Id.

The Court does not understand Thomas's retaliation argument to be based on Bateson's denial of the OSS III promotion request made by Daniels. His retaliation argument is based on the complaints that he made subsequent to the denial, which resulted in his transfer to the IT Department. Therefore, under Thomas's theory, the allegedly adverse action took place following his engagement in protected activity.

With respect to GLWA's argument that Thomas's transfer resulted from the elimination of the CIP section, that assertion is misleading. After GLWA eliminated the CIP section, it assigned Thomas to another position in the finance department under Kosters. DSMF ¶ 35. Thomas remained in that position for several months before being urged to accept a position in the IT Department. Id. ¶¶ 36-37. So while the elimination of the CIP section resulted in Thomas being transferred to another position in the finance department, there remains a fact question with regard to whether Thomas was urged to accept the position in the IT Department as retaliation for his complaints about racial animus.

Based on the limited arguments presented by the parties, Thomas has met his burden of showing that GLWA's reasons for its adverse employment actions were pretext for retaliation.

"Pretext can be shown by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." Wheat, 785 F.3d at 240. To the extent that GLWA is arguing that it urged Thomas to accept a less distinguished and more physically demanding position due to poor performance, Thomas has raised a triable fact question as to whether that reason had a basis in fact. GLWA says that Thomas had some performance issues. Daniels disagrees. GLWA has argued that Daniels's performance review demonstrates Thomas's poor performance. Nonetheless, Daniels recommend Thomas for a promotion and a significant raise. Whether Thomas's performance was deficient in some manner is fact bound. Therefore, GLWA's motion is denied on the issue of pretext.

### IV. CONCLUSION

For the reasons discussed above, GLWA's motion for summary judgment (Dkt. 30) is granted with respect to Thomas's Title VII retaliation claim. The motion is denied in all other respects. GLWA also filed a motion to strike (Dkt. 35) portions of Monica Daniels's affidavit submitted in support of Thomas's response brief. It requests that the Court not rely on any of the disputed paragraphs when considering its motion for summary judgment. Because the Court did not rely on Daniels's affidavit to resolve the motion for summary judgment, GLWA's motion to strike is denied as moot.

    SO ORDERED.

Dated: September 21, 2020          s/Mark A. Goldsmith
       Detroit, Michigan          MARK A. GOLDSMITH
                                                            United States District Judge